**In the United States District Court
for the District of Kansas**

---

Case No. 19-cv-02376-TC

---

EST INC. D/B/A ENVIRO SCIENCE TECHS.,

*Plaintiff/Counterclaim Defendant*

v.

ROYAL-GROW PRODS., LLC,

*Defendant/Counterclaim Plaintiff*

v.

VINAY PATEL,

*Counterclaim Defendant*

---

**MEMORANDUM AND ORDER**

Royal-Grow Products, LLC, has asserted several claims, including breach of contract, Lanham Act violations, and other equitable claims against EST, Inc., and Vinay Patel. Doc. 94. EST and Patel have filed a Motion for Partial Summary Judgment, arguing they are entitled to judgment as a matter of law with respect to certain counterclaims and Royal-Grow's request for punitive damages. Docs. 95–96. For the following reasons, the Motion is granted in part and denied in part.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144

1

F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes —even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

## B

**1.** Generally speaking, this case arises from a longstanding business relationship between EST and Royal-Grow. Royal-Grow markets and distributes agricultural products but relied on EST to manufacture the products at issue in this litigation. *See* Doc. 105 at 3–6, ¶¶ 3–6. EST, led by Patel, is a specialty chemical company that manufactures agricultural products in Kansas and sells those products primarily to distributors. Doc. 105 at 3–5, ¶¶ 2–5; 2–3, ¶ 1.

In 2012, Royal-Grow and/or its parent company entered into a written license and distribution agreement with EST. *See* Doc. 105 at 4–6, ¶ 5–6. Under that agreement, Royal-Grow obtained an exclusive license to market and sell certain EST-developed and -manufactured agricultural products. *See* Doc. 102-6. At some point, EST began manufacturing the following liquid products for Royal-Grow: 0-0-50, Enzyme Max, and Transcend. Doc. 105 at 6–7, ¶¶ 7–8. The parties agreed on the product formulas EST was to make for Royal-Grow and that EST would place Royal-Grow labels on those finished products. Doc. 105 at 7–12, ¶¶ 9–12. Royal-Grow then purchased these EST-manufactured products and sold them to its ultimate customers in bottles, jugs, pails, drums, and totes. Doc. 105 at 7, ¶ 8. EST did not sell or ship any of the Royal-Grow products at issue directly to Royal-Grow's customers. Doc. 105 at 60–66, ¶¶ 54–58.

Much of this dispute concerns Royal-Grow's Enzyme Max product. The labels Royal-Grow approved for this product bore the words "Enzyme Max" or "Enzyme Max®." *See* Doc. 105 at 12–13, ¶ 13. Royal-Grow has sold this product to customers since February 2015. Doc. 105 at 73–74, ¶ 17. But it was not until July 2017 that Royal-Grow filed a trademark application—for both "Enzyme Max" and the shortened product name "E Max." Doc. 105 at 38, ¶¶ 34, 37. Although the U.S. Patent and Trademark Office granted registration of both marks, Doc. 105 at 70–71, ¶¶ 9–10, Royal-Grow's actual product never bore an "E Max" label. Doc. 105 at 12–13, ¶¶ 13–14. Royal-Grow did, however, use the name "E Max" on bills of lading, emails, purchase orders, receipts, and advertisements. Doc. 105 at 75, ¶ 20; 81–83, ¶¶ 26–30.

In addition to manufacturing products for Royal-Grow, EST also manufactures and sells other agricultural products with similar or identical chemical compositions. Doc. 105 at 105–07, ¶¶ 61–62. This suit concerns two lines of EST products, the full names of which have varied: (1) the "E-Max Soil Zyme with Microbes" and (2) "NanoZyme" product lines.  Doc. 105 at 19–32, ¶¶ 19–30. EST has advertised the E-Max line since July 2014, Doc. 105 at 19–21, ¶ 19, though it is less clear when its first sale occurred. It has sold NanoZyme products since April 12, 2016, but sells this product only to another distributor and not directly to consumers. Doc. 105 at 30–32, ¶¶ 28–30.

**2.** Two major disagreements give rise to the remaining claims in this lawsuit. The parties, not surprisingly, have differing views on them.

**a.** One concerns the original formulation of Royal-Grow's Enzyme Max and EST's E-Max products. Royal-Grow has submitted evidence to support its claim that it created the formula for Enzyme Max in spring 2014 and independently decided on the Enzyme Max name—and E Max shorthand—at that time. Doc. 105 at 72–73, ¶¶ 14–16. In contrast, the EST Defendants claim that EST formulated the product and voluntarily supplied its product data—labeled "E-Max Soil Zyme with Microbes"—to Royal-Grow in summer 2014, in order to forge a manufacturing relationship. Doc. 105 at 23–25, ¶¶ 21–22. For purposes of summary judgment, Royal-Grow's view of the facts are accepted as true.

**b.** The other centers on the identification and protection of commercial names for the parties' products. Royal-Grow has submitted evidence that it informed the EST Defendants in April 2017 that Royal-Grow was seeking to register trademarks in both the Enzyme

3

Max and E Max names. Doc. 105 at 109–113, ¶ 68. Additionally, Royal-Grow has submitted evidence supporting its claim that the EST Defendants agreed, during a conversation in 2015, to cease using EST's own "E-Max" product name. Doc. 105 at 108–09, ¶ 67.

The EST Defendants deny that these conversations occurred. Doc. 105 at 108–09. Moreover, they ask the Court to disregard Royal-Grow's declaration supporting the 2017 conversation because it conflicts with Royal-Grow's deposition testimony and is, therefore, a "sham affidavit." Doc. 105. at 109–13, ¶ 68; *see Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (holding that courts may disregard affidavits which conflict with an affiant's prior sworn statement).

For purposes of summary judgment, Royal-Grow's view must prevail, as the two pieces of evidence EST identifies are not in direct conflict. The declaration speaks to discussions that allegedly occurred *before* Royal-Grow applied for a trademark, while the identified deposition testimony concerns whether Royal-Grow informed EST *after* it had already applied for or obtained a trademark. *See* Doc. 105 at 109–13, ¶ 68. This may create a question of credibility for the jury, but it does not necessarily make Royal-Grow's declaration "an attempt to create a sham fact issue" that should be ignored at the summary judgment stage. *See Franks*, 796 F.2d at 1237.

**3.** EST initially filed this action against Royal-Grow for alleged nonpayment of amounts due under the parties' contracts. *See* Doc 1. In response, Royal-Grow filed counterclaims against both EST and Patel. *See* Doc. 8.

EST and Royal-Grow have settled EST's original contract claims. Doc. 91. As a result, only Royal-Grow's counterclaims remain. Doc. 91. Specifically, Royal-Grow pled claims against both EST Defendants for unjust enrichment, tortious interference, conversion, Lanham Act violations, and civil conspiracy. Docs. 8 & 94 at ¶ 4. It also has a claim against EST (but not Patel) for breach of contract. Docs. 8 & 94 at ¶ 4.

The EST Defendants seek summary judgment on fewer than all of Royal-Grow's claims.[1] In their Motion for Partial Summary Judgment, they seek judgment on the unjust enrichment, Lanham Act, and civil conspiracy claims. *See generally* Doc. 96. They also seek a ruling that Royal-Grow may not pursue punitive damages at trial. *Id.* at 32–33. They do not, however, seek judgment on the contract, tortious interference, or conversion claims. *See generally* Doc. 96. As a result, this case will proceed to trial; the question is which claims will be presented to a jury.

## II

The EST Defendants' motion for partial summary judgment is granted in part and denied in part. The EST Defendants are entitled to judgment on Royal-Grow's unjust enrichment claim, civil conspiracy claim, and Lanham Act Section 43 false advertising claims. They are also granted judgment on the Section 32 claim related to Royal-Grow's E Max mark, the Section 32 and 43 claims related to EST's NanoZyme mark, and the Section 43 false association claim related to Royal-Grow's chemical formula. Finally, the EST Defendants are granted judgment on any punitive damages request related to Royal-Grow's breach of contract claim. But summary judgment is denied as to the remaining counterclaims (*i.e.*, the Lanham Act Section 32 and 43(a) false association claims related to EST's E-Max mark) and the request for punitive damages for non-contract claims.

### A

Royal-Grow asserts a claim for unjust enrichment, arguing that EST benefitted by accepting payment from Royal-Grow while impermissibly using Royal-Grow's proprietary information to sell competing products. Doc. 94 at ¶ 4.a.ii; *see also Haz-Mat Resp., Inc. v. Cert. Waste Servs., Ltd.*, 910 P.2d 839, 847 (Kan. 1996) (defining unjust enrichment elements). The EST Defendants make two arguments in support of their motion for summary judgment. Both are well-founded.

The EST Defendants correctly argue that the existence of an enforceable contract between Royal-Grow and EST precludes the unjust

---

[1] The parties assert that Kansas law governs each of the substantive claims in this case. Doc. 94 at ¶ 1.d; *see generally* Docs. 96, 102, 105. This Memorandum and Order assumes, without deciding, that they are correct.

enrichment claim. *See Midwest Asphalt Coating, Inc., v. Chelsea Plaza Homes, Inc.*, 243 P.3d 1106, 1110 (Kan. Ct. App. 2010) This rule bars Royal-Grow's equitable claim. The conduct that Royal-Grow identifies as giving rise to the unjust enrichment claim is the very same as that alleged to have violated the parties' contract. Doc. 94 at ¶ 4.a.i–ii. While EST disputes that it breached any contract or, if it did, that any damage occurred, it does not dispute the *existence* of the agreements at issue. Doc. 94 at ¶ 4.b. As a result, Royal-Grow may not pursue an unjust enrichment claim against EST. *See, e.g.*, *Lindsey Masonry Co. v. Murray & Sons Constr. Co.*, 390 P.3d 56, 69–70 (Kan. Ct. App. 2017) (affirming that there was "no reason to resort to equitable remedies" since the trial court found that a contract did in fact exist); *see also In re Estate of Ramsey*, 2020 WL 3579783, at *6–7 (Kan. Ct. App. July 20, 2020) (agreeing that "the existence of [an] express oral contract precludes a claim in equity").

The unjust enrichment claim against Patel in his individual capacity also fails, but for a different reason. Unlike EST, Patel was not party to the contracts between EST and Royal-Grow. As a result, the rule that benefitted EST does not apply with regard to Patel. *See JA-DEL, Inc. v. Winkler*, 2019 WL 166936, at *3 (Kan. Ct. App. Jan. 11, 2019) (recognizing the contract/legal remedy rule does not preclude unjust enrichment claims against other persons "associated with the contract" but not actually party to it). Patel is nonetheless entitled to judgment because Royal-Grow lacks any proof that he received an individual benefit through EST's dealings with Royal-Grow. Doc. 96 at 14–15. Royal-Grow's unjust enrichment claim against Patel fails. *See Haz-Mat Resp.*, 910 P.3d at 847 (requiring a benefit conferred for an unjust enrichment claim)

Royal-Grow seeks to salvage the claim by invoking the doctrine of alter ego. Doc. 102 at 48–51. Generally speaking, that doctrine imposes "liability on the individual who uses a corporation merely as an instrumentality to conduct his own business." *Sampson v. Hunt*, 665 P.2d 743, 751 (Kan. 1983). In other words, Royal-Grow contends that because Patel holds such a large ownership interest in EST, the corporation is merely his alter ego and, as a result, any benefit to the corporation flowed to him.

Kansas law contradicts Royal-Grow's argument. The effect of the alter ego doctrine is not to expand individual liability for individual actions; it is to bypass the corporate form in only the rarest of circumstances (*e.g.*, fraud) such that the individual becomes responsible for

6

*corporate* liabilities when the corporation cannot or will not meet its financial obligations. *Sampson*, 665 P.2d at 751; *cf.* K.S.A. 17-7101(b). Thus, the alter ego doctrine can only impose liability that is derivative of corporate liability. *See Kilpatrick Bros., Inc. v. Poynter*, 473 P.2d 33, Syl. ¶ 5 (Kan. 1970). It does not create a novel, equitable cause of action against a corporation's shareholder where the corporation itself cannot be held responsible.

**B**

Royal-Grow also asserts two types of claim under the Lanham Act. In one, it asserts that the EST Defendants infringed on the registered trademarks "E Max" and "Enzyme Max" in violation of Section 32, 15 U.S.C. § 1114. Doc. 94 at ¶ 4.a.v. In the other, Royal-Grow alleges that the EST Defendants engaged in multiple forms of unfair competition in violation of Section 43, 15 U.S.C. § 1125. Doc. 94 at ¶ 4.a.vi.

Section 32 of the Lanham Act generally precludes using or imitating a registered mark to confuse consumers. *See generally* 15 U.S.C. § 1114. To succeed on such a claim, the plaintiff must establish possession of a valid, protectable registered mark and defendant's wrongful use of that mark, or a colorable imitation, in commerce and in a way likely to deceive or confuse consumers. 15 U.S.C. 1114(1); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1158 (10th Cir. 2013). Intent is not required for liability. *Water Pik*, 726 F.3d at 1158. It can, however, be relevant to prove a likelihood of confusion, in that "one can infer [such] likelihood . . . from a defendant's selection of a mark with the intent to cause confusion." *Id.*

Section 43 claims differ from Section 32 claims in two material respects. First, Section 43 is broader, protecting not only registered marks but also unregistered marks and "trade dress." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Second, Section 43 encompasses two distinct types of claims: false association, 15 U.S.C. § 1125(a)(1)(A), and false advertising, 15 U.S.C. § 1125(a)(1)(B)). *See Lexmark Int'l, Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 122 (2014). The false association elements under Section 43 are like those of a Section 32 infringement claim. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). But a false advertising claim under Section 43 is distinct, focusing on false or misleading statements in connection with commercial advertising. *See* 15 U.S.C. § 1125(a)(1)(B); *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002).

**1.** For its Section 32 infringement claim, Royal-Grow asserts that the EST Defendants infringed on Royal-Grow's registered Enzyme Max and E Max marks by selling products in EST's "E-Max Soil Zyme" and "NanoZyme" lines. Doc. 94 at ¶ 4.a.v; Doc. 102 at 3 n.2. The EST Defendants seek summary judgment on three independent grounds.

As explained in greater detail, *infra*, EST has established that it is entitled to judgment on Royal-Grow's infringement claims in two respects. First, Royal-Grow lacks evidence that it used the "E Max" mark in commerce. Second, Royal-Grow has not demonstrated a question of fact as to possible confusion between its Enzyme Max mark and EST's NanoZyme product. There is, however, a question of fact concerning whether EST's E-Max Soil Zyme mark infringes on Royal-Grow's Enzyme Max mark.

**a.** Focusing on Royal-Grow's claim to protect its registered E Max mark, the EST Defendants contend that the claim fails because Royal-Grow did not use its E Max mark "in commerce" as 15 U.S.C. § 1051 requires. Doc. 96 at 16–20; *see generally Aycock Engr., Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) ("The registration of a mark that does not meet the use requirement is void ab initio."). Royal-Grow offers two contrary arguments, but both fail.

Royal-Grow argues that it used the E Max mark on various documents associated with product shipments and sales, such as receipts, invoices, bills of lading, and web pages. Doc. 102 at 54; Doc. 105 at 75, ¶ 20; 81–83, ¶¶ 26–30. Use of marks on these types of documents can constitute "use in commerce" if, but only if, the goods themselves are of such a nature that a mark cannot physically be affixed to them. *See* 15 U.S.C. § 1127 (defining "use in commerce" to include mark placement on associated documents "if the nature of the goods makes [placement of the mark on the goods, their containers, displays, tags, or labels] impracticable").

Here, however, the uncontroverted facts confirm that Royal-Grow's product was sold in containers that had *a* mark on them, just not the E Max mark. Doc. 105 at 12–13, ¶¶ 13–14. Because Royal-Grow's product could bear a mark (and Royal-Grow chose not to affix the E Max mark to it), Royal-Grow's use of the E Max mark on the documents associated with the product cannot be used to satisfy the "use in commerce" requirement of Section 1127. Royal-Grow's Section 32 claim based on the E Max mark therefore fails. *See In re Dura*

*Corp.*, 188 U.S.P.Q. 701 (T.T.A.B. 1975) (holding packing inserts did not "affix" a mark so as to be "use in commerce"); *In re Chi. Rawhide Mfg. Co.*, 455 F.2d 563, 564–65 (Cust. & Pat. App. 1972) (same as to invoices); *S. Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 887 (N.D. Ill. 1998) (same as to advertising materials); *Kische USA LLC v. Simsek*, No. C16-0168JLR, 2017 WL 5881322, at *9 (W.D. Wash. Nov. 29, 2017) (same as to brochures, receipts, and emails); *cf. Southco, Inc. v. Fivetech Tech., Inc.*, 982 F. Supp. 2d 507, 511–12 (E.D. Pa. 2013) (observing that a mark's use in website materials, product catalogues, and price quotes also fails as "use in commerce" because the statute requires that goods bearing the mark be "sold or transported in commerce").

Royal-Grow also argues that shipping labels affixed to boxes containing the Enzyme Max product have, at least once, borne the E Max mark. Doc. 102 at 54; Doc. 105 at 79–81, ¶ 25. Such use can satisfy Section 1127's "use in commerce" definition. *Haggar Int'l Corp. v. United Co. Food Indus. Corp.*, 906 F. Supp. 2d 96, 113 n.26 (E.D.N.Y. 2012) (citing *In re Schering-Plough Corp.*, 211 U.S.P.Q. 69 (T.T.A.B. 1981) (recognizing that the use of a mark on a shipping label attached to a container is properly regarded as "'affixed' to the product"); 2 McCarthy on Trademarks & Unfair Competition § 16.28 (5th ed. 2021)); *see also In re A.S. Beck Shoe Corp.*, 161 U.S.P.Q. 168 (T.T.A.B. 1969) (determining labels affixed to shipping container for shoes to be sent by mail sufficed as a "use in commerce").

This argument fails because Royal-Grow has provided no admissible evidence in support. *But see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998) (recognizing that to survive summary judgment the party bearing the burden of proof at trial must set forth *admissible* supporting facts sufficient to permit a jury to find in its favor). The only piece of evidence Royal-Grow provides to support its shipping label argument is a single photograph, purporting to show that EST once placed "E Max" shipping labels on Royal-Grow's product. Doc. 102 at 37, 54; Docs. 102-8 & 102-14. The EST Defendants contend—and Royal-Grow's own exhibits confirm—that Royal-Grow had not previously disclosed this evidence in discovery. Doc. 105 at 13–15, ¶ 15. Royal-Grow suggests that the photo was not among the documents the EST Defendants requested in discovery. Doc. 102-8 at ¶ 14. But even crediting that argument, it should have been disclosed pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), and Royal-Grow does not argue—and certainly has not established—that its failure to disclose

9

was either substantially justified or is harmless as Fed. R. Civ. P. 37(c) requires before a party may use undisclosed evidence at trial. *See, e.g., Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999); *Univ. of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1228–30 (D. Kan. 2008). As a result, it lacks evidence to create a triable issue of fact, and the EST Defendants are entitled to judgment as a matter of law on this issue.[2]

**b.** The EST Defendants next argue they are entitled to judgment on Royal-Grow's request for monetary damages because they lacked notice that Royal-Grow had registered its marks. Doc. 96 at 27 (pointing to 15 U.S.C. § 1111's requirement of notice as a precondition to profits and damages). Royal-Grow claims it put the EST Defendants on actual notice as to both marks during a 2015 conversation, in which EST allegedly agreed to cease using its E-Max Soil Zyme mark, and during an April 2017 conversation, in which Royal-Grow allegedly informed Patel it planned to apply for trademarks. Doc. 102 at 73. The EST Defendants dispute that such conversations occurred, Doc. 105 at 108–13, ¶¶ 67–68, but at this stage Royal-Grow is entitled, as non-movant, to its version of the facts. *Adler*, 144 F.13d at 670. Royal-Grow has also presented undisputed facts that it sent updated labels to EST bearing the words and symbol "Enzyme Max®," putting the EST Defendants on notice as to the Enzyme Max mark. Doc. 105 at 12–13, ¶ 13; 113–14, ¶ 70. Thus, a reasonable jury could determine the EST Defendants had notice of registration under 15 U.S.C. § 1111. Accordingly, EST Defendants are not entitled to judgment on Royal-Grow's request for monetary damages.

**c.** Finally, the EST Defendants argue they are entitled to judgment on Royal-Grow's Section 32 claim because there is no reasonable possibility of consumer confusion. Likelihood of confusion is not only an essential element of a successful claim but is also frequently the "central question." *1-800 Contacts*, 722 F.3d at 1238. Typically, it is a fact question, not often amenable to summary judgment. *Cf. King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d at 1084, 1089 (10th Cir. 1999); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 923 n.2 (10th Cir. 1986). Nonetheless, courts have the obligation to enforce the

---

[2] Summary judgment is an interlocutory decision. *Cf. Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003). As a result, Royal-Grow is not necessarily precluded from subsequently seeking to establish that its failure was substantially justified or harmless.

outermost bounds of consumer confusion. *King of the Mountain*, 185 F.3d at 1089. To do so, courts must evaluate whether there is minimally sufficient evidence based on six nonexclusive factors: mark similarity, intent, evidence of actual confusion, product similarity, consumer care, and mark strength. *See*, *e.g.*, *1-800 Contacts*, 722 F.3d at 1239. The existence or absence of any one factor is not dispositive. *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005).

**(i).** Based on the summary judgment pleadings, there is sufficient evidence to permit a reasonable jury to return a verdict in favor of Royal-Grow as to EST's E-Max family of marks. To begin with, EST acknowledges the products are similar in their uses but argues they are sufficiently distinct in how they are marketed. Doc. 96 at 25; *see Sally Beauty*, 304 F.3d at 974. But EST (like Royal-Grow) advertises its products online and sells not only to other distributors but also to ultimate consumers. Doc. 105 at 19–21, ¶ 19, 25–27; ¶ 23, 141–41. This product similarity weighs in favor of confusion. *See Sally Beauty*, 304 F.3d at 974–75.

So, too, with the question of mark similarity. While there is admittedly little visual similarity between the competing marks, *compare* Doc. 96-5, *with* Docs. 96-6–96-9, the marks are similar in sound and meaning. They phonetically resemble each other, and the word "max" in conjunction with "E" or "Enzyme" connotes a similar meaning.

As to EST's intent, the parties have competing narratives of how, when, and under whose direction their products were formulated, named, and marketed. Doc. 105 at 23–25, ¶¶ 21–22; 72–73, ¶¶ 14–16. Royal-Grow, however, has identified evidence that would allow a reasonable jury to find that Royal-Grow adopted the Enzyme Max/E Max names first, that EST had full knowledge of Royal-Grow's plan to market under those names, and that EST intentionally chose to use a similar mark regardless. *See Beer Nuts*, 805 F.2d at 927 (noting the mere adoption of a similar mark can give rise to an inference of intent, where the adopting party knows of the prior mark's existence). Additionally, Royal-Grow points to the alleged 2015 conversation in which Patel agreed EST would stop using its E-Max mark and 2017 conversation in which Royal-Grow informed Patel of its intent to apply for registration. Doc. 105 at 108–13, ¶¶ 67–68. A reasonable jury could infer intent after these conversations.

The question of Royal-Grow's mark strength must also be reserved for the jury. Royal-Grow's marks are, at best, "suggestive" and, at

11

worst, "descriptive." *Compare* Doc. 102 at 70, *with* Doc. 96 at 22; *see also Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1245 (10th Cir. 2016). A merely descriptive mark is still entitled to protection if it has attained "secondary meaning," *Two Pesos*, 505 U.S. at 769, which occurs when a mark "come[s] to stand in the minds of the public as a name or identification for that product or firm." *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988). Because Royal-Grow has identified evidence of advertising efforts, customer communications, and alleged imitation, the jury is entitled to decide the issue of mark strength based on the parties' evidence. *See Forney Indus.*, 835 F.3d 1238, 1253 (10th Cir. 2016); *Marker Int'l*, 844 F.2d at 764.

Of course, not all of the factors favor confusion. With regard to customer care, Royal-Grow presents no evidence except a conclusory statement from its expert that customer care is irrelevant because confusion cannot be avoided in this case. Doc. 102 at 69. And with regard to evidence of actual confusion, Royal-Grow argues facts that *could* support an inference of actual confusion, but the evidence appears de minimis, at best. Specifically, two of Royal-Grow's customers switched to EST's product after previously buying Royal-Grow's. But one of these customers switched after a two-year purchasing hiatus, and even Royal-Grow acknowledges this was due to customer dissatisfaction with Royal-Grow. *See* Doc. 102 at 65. The other switched within a two-month timeframe, which as Royal-Grow argues, could support an inference of confusion. Doc. 102 at 64–65. But only one instance is de minimis. *See Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1004–05 (10th Cir. 2014) (disregarding, as "de minimis," evidence of approximately eight separate instances of customers contacting one party in regard to the other competing product).

The evidence is far from one-sided and leads to no obvious answer. On balance, Royal-Grow has presented several genuine questions of fact that prevent summary judgment on the issue of E-Max's likelihood to cause consumer confusion.

**(ii).** But there is insufficient evidence to support a possibility—much less a likelihood—of confusion with respect to EST's NanoZyme mark(s). EST's NanoZyme products and Royal-Grow's Enzyme Max product are similar in their uses, *see* Doc. 96 at 25, but diverge in their marketing channels. Doc. 105 at 30–32, ¶¶ 28–29 (NanoZyme sold only to another distributor as a private label and not to end consumers). The marks—viewed generously in Royal-Grow's favor—have arguable sight similarities, but only in that they both

12

appear against green photographs of plant life. *Compare* Doc. 96-5, *with* Doc. 96-10. EST's mark is distinct in font and layout, and the marks bear no similarity in sound or meaning.

Their only, remote, relation is the "zyme" subpart. In Royal-Grow's mark, that subpart forms a mere syllable of the word "enzyme," and in EST's mark it is a standalone signifier. *Cf. Sally Beauty*, 304 F.3d 964, 973 (stating trial court erred in cherry-picking the word "generic" from "Generic Value Products" to find, erroneously, that the mark sounded similar to "GENERIX"). Further, the word "enzyme" in Royal-Grow's mark is modified by "max"—which is short for "maximum" or "very big, enormous." *Max, adj.*, Oxford English Dictionary (3d ed., 2020 update). In contrast, EST's mark places the word "zyme" in conjunction with the prefix "nano," which technically means "one billionth" and colloquially denotes something "extremely small." *Nano-*, Oxford English Dictionary (3d ed., 2020 update). The use of the color green on a label cannot override these stark differences; the marks are not similar.

Neither has Royal-Grow pointed to any evidence of intent, consumer care, or actual confusion with the NanoZyme mark. Instead, the alleged conversations with Patel and the customer switches all concern EST's E-Max mark. Doc. 105 at 108–13, ¶¶ 67–68. While Royal-Grow's mark strength remains in question, even a finding that its marks are "suggestive" would fail to support confusion where there is no evidence capable of satisfying the other factors. In fact, other than including the NanoZyme marks with the E-Max marks in its list of "infringing" names, Royal-Grow offers no argument, much less evidence, as to how the NanoZyme marks might generate confusion or otherwise violate Royal-Grow's rights. *See generally* Doc. 102.

The EST Defendants are entitled to judgment on Royal-Grow's Lanham Act claims related to NanoZyme, as Royal-Grow cannot show any likelihood of consumer confusion.

**2.** The EST Defendants also contend that they are entitled to judgment as a matter of law regarding Royal-Grow's claims under Section 43(a)(1)(A) and (a)(1)(B) of the Lanham Act. That request is granted in part and denied in part.

Royal-Grow's false association claims under Section 43(a)(1)(A) can be subdivided into two baskets. In one, Royal-Grow contends that EST used similar marks that are likely to cause confusion with Royal-

Grow's Enzyme Max and E Max marks.[3] *See* Doc. 94 at ¶ 4.a.vi. In the other, Royal-Grow contends that the EST Defendants used Royal-Grow's proprietary formula in EST's products. *See* Doc. 94 at ¶ 4.a.vi.

The claim in the first basket survives for many of the same reasons set forth in Part II.B.1.c., *supra*. The elements of this claim mirror those of the Section 32 infringement claim, and again, the question of customer confusion predominates. *1-800 Contacts*, 722 F.3d at 1238. Due to these parallels, the allegations, arguments, and key question (*i.e.*, likelihood of confusion) are identical to the Section 32 claim addressed above. Thus, for the same reasons discussed in Part II.B.1.c., *supra*, there are sufficient genuine factual disputes relating to EST's E-Max marks that this claim may proceed to trial.[4]

The claim in the second basket, however, fails as a matter of law because product recipes or formulae—the manufactured goods themselves—are not trademarks. 15 U.S.C. § 1127 (defining trademarks to include "any word, name, symbol, or device" used to "identify and distinguish . . . goods"). As early as 1924, the Supreme Court observed that a party generally has "no exclusive right to the use of its formula" under trademark law. *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 531 (1924).

Neither, on these facts, does Royal-Grow's proprietary formula amount to protectable "trade dress." *Warner* involved the owner of a brand name medicine seeking to protect its use of chocolate as an ingredient. The Court observed that chocolate did not merely serve to create a "distinctive" product color but also improved the product's taste and consistency, meaning that "it serve[d] a substantial and desirable use, which prevents it from being a mere matter of dress." *Warner*, 265 U.S. at 531. Where an ingredient, or combination of ingredients, does "not merely serve the incidental use of identifying the

---

[3] The EST Defendants are entitled to summary judgment with respect to the Section 32 claim involving Royal-Grow's E Max mark because Royal-Grow failed to establish it used the mark in commerce—a prerequisite of trademark registration. Part II.B.1.a., *supra*. This does not preclude a Section 43 claim, however, because Section 43 of the Lanham Act protects unregistered and registered marks alike. *Two Pesos*, 505 U.S. at 767.

[4] And, for the same reasons explained in Part II.B.1.c., *supra*, Royal-Grow's claim may not proceed as to the NanoZyme marks.

14

respondent's [product]," the Supreme Court held it is not protectable trade dress. *Id.*

The *Warner* decision predates the Lanham Act, but its same reasoning underlies the modern test for identifying trade dress. *Cf. Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 861 n.2 (1982) (White, J., concurring) ("[T]he purpose of the Lanham Act was to codify and unify the common law . . . . There is no suggestion that Congress intended to depart from *Warner* . . . ."). Specifically, Section 43 protects, as trade dress, features that comprise a "product's look or image"—even if those features are part of the product itself and not merely its packaging. *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995), *cert denied*, 516 U.S. 1067 (1996). Section 43 does not, however, protect features that are merely "functional," meaning features that competitors must incorporate to create an equally functional product. *Id.* at 1502–03. Stated differently, a product feature is not functional—and may be protectable trade dress—"if the feature enables the [competitor] simply to market his product more effectively." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 519 (10th Cir. 1987).

The chemical composition of Royal-Grow's product is not subject to Lanham Act protection. Royal-Grow has not demonstrated that its formula is either a feature that only exists to enable unique marketing or a feature without which a competitor may make an equally functional product. As a result, Royal-Grow's formula is not protectable trade dress. *Brunswick Corp.*, 832 F.2d at 519; *cf. Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32–33 (2003). The EST Defendants are hereby granted judgment as to any claim for trade dress infringement or Section 43 false association based on the use of Royal-Grow's formula.

**3.** Royal-Grow's final Lanham Act claim proceeds under Section 43(a)(1)(B), the false advertising subsection. Its sole theory is that the EST Defendants manufactured and provided Royal-Grow with product that did not comply with its label's "Guaranteed Analysis" of ingredients. *See* Doc. 94 at ¶ 4.a.vi. That claim fails because there is no evidence that EST engaged in any false advertising.

To make out a viable Section 43 false advertising claim, Royal-Grow must have evidence that the EST Defendants made, in commerce, a material misrepresentation in connection with the "commercial advertisement or promotion" of its product, such that consumers

were likely to be confused and the plaintiff was actually injured. *Sally Beauty*, 304 F.3d at 980; *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000). Here, that fundamental element is missing: there is no evidence that the EST Defendants made any representations in connection with the commercial advertising or promotion of the product it sold. *But see Sally Beauty*, 304 F.3d at 980 (requiring such evidence to support a claim). As the EST Defendants note, they did not make the representations in an act of competition or promotion. Instead, EST's audience for the representations was not the purchasing public but Royal-Grow itself. *See* Doc. 105 at 122, ¶ 83; 147–48. And the EST Defendants made these representations pursuant to their agreement with Royal-Grow. *Id.* While EST may incur liability (*e.g.*, breach of contract) for failing to provide a conforming product, that liability does not arise under Section 43 of the Lanham Act because there is no evidence that EST made any commercial advertising or promotional speech with respect to its product. *Sports Unltd., Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1005 (10th Cir. 2002) (holding that for purposes of a Section 43 false advertising claim, there must be "*some* level of *public* dissemination of information") (emphasis original).

Royal-Grow has failed to identify any authority recognizing Section 43 false advertising liability in a situation like this one. The two cases it offers to support its claim are readily distinguishable. *See* Doc. 104 at 75–79. In *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, beer manufacturer sued a "distributor" who was purchasing trademarked beer from end retailers and then reselling it in new sales territories without authorization and without observing quality standards. 486 F. Supp. 131, 133 (D. Colo. 1980). And in *El Greco Leather Prods. Co., Inc., v. Shoe World, Inc.*, the Second Circuit permitted a designer's claim against a manufacturer who sold goods bearing the designer's mark after the goods had been rejected as non-conforming. 806 F.2d 392, 393–94 (2d Cir. 1986). In both cases, the defendant put non-conforming goods directly into the stream of commerce without the plaintiff's permission. Moreover, neither case addressed the "commercial advertising or promotion" element of Section 43. Here, however, Royal-Grow has failed to identify evidence supporting the "commercial advertisement or promotion" element. Instead, the crux of the claim is that EST had an obligation to manufacture certain goods for Royal-Grow and allegedly failed to manufacture them in conformance with parameters. If true, that error is a breach of contract, not a false advertisement.

## C

Royal-Grow also asserts a civil conspiracy claim against EST and Patel. Doc. 94 at ¶ 4.a.vii. Royal-Grow's theory is that EST conspired with Patel to violate Royal-Grow's rights and to steal and misuse Royal-Grow's proprietary information. Doc. 94 at ¶ 4.a.vii. As the EST Defendants argue, Doc. 96 at 31, this theory fails as a matter of law because a corporation and its officer generally cannot conspire.

A civil conspiracy requires a minimum of two actors. *Stoldt v. Toronto*, 678 P.2d 153, 156 (Kan. 1984). Because a corporation can only act by and through its officers and directors, *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008), a corporation and its officer cannot conspire when the officer is acting within his or her official capacity. *May v. Santa Fe Trail Transp. Co.*, 370 P.2d 390, 395 (Kan. 1962). Thus, Patel and EST could not conspire together at any time Patel was acting in his official role. *Id.*

Royal-Grow seeks to avoid this conclusion by citing *Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719 (10th Cir. 1984). *See* Doc. 102 at 80. In that case, the Tenth Circuit affirmed a jury verdict for civil conspiracy against two corporate officers against whom there was a mountain of evidence to support that they had acted outside of their official capacities by engaging in fraudulent behavior of a type the corporation had expressly prohibited. *See Wegerer*, 744 F.2d at 725–27 (describing the circumstances showing the officers acted beyond their scope).

*Wegerer* is inapposite for several reasons. For one thing, there is no evidence to suggest that any of Patel's statements exceeded his corporate authority, much less that they contradicted express corporate directives (as was the case in *Wegerer*). In fact, even assuming Patel's statements could be considered tortious, that alone does not mean that he acted outside his scope. *Cf. Anderson v. Heartland Oil & Gas, Inc.*, 819 P.2d 1192, 1200 (Kan. 1991). In contrast, there was ample evidence in *Wegerer* to show the corporate officers acted beyond the scope of their authority and for their direct, and exclusive, personal benefit. *See* 744 F.2d at 725–27.

For another, *Wegerer*'s alternative holding, imposing liability on individual officers based on alter ego notions, is also far afield of the facts here. The evidence in *Wegerer* demonstrated that the two officers (who were the sole shareholders and directors) used the corporation

as an instrumentality to conduct their own personal business and visit fraud on the corporation's clients. *See* 744 F.2d at 726–27. Here, there are no similar facts suggesting Patel committed such an egregious violation, individually profited from EST's dealings with Royal-Grow, misused EST, or misled Royal-Grow about EST's interests. As a result, *Wegerer* does not support liability here. *See*, *e.g.*, *Diederich*, 196 P.3d at 420 (rejecting a similar argument invoking *Wegerer* because there were no facts suggesting the defendants acted outside the scope of their duties).

## D

Finally, Royal-Grow seeks punitive damages against the EST Defendants. Doc. 94 at ¶ 5. The parties do not attempt to parse which of Royal-Grow's claims might (or might not) give rise to a request for punitive damages.[5] Instead, the EST Defendants assume that a uniform willful and wanton standard applies and cannot be met because Royal-Grow "has presented no evidence in this case that [the EST Defendants] engaged in any willful, malicious, fraudulent, or wanton conduct." Doc. 96 at 33.

---

[5] For example, Kansas law precludes a claim for punitive damages on a breach of contract theory. *See*, *e.g.*, *Cornwell v. Jespersen*, 708 P.2d 515, 523 (Kan. 1985). At the same time, many common law tort claims can give rise to punitive damages. *See generally*, *e.g.*, *Lindsey v. Miami Cty. Nat'l Bank*, 984 P.2d 719 (Kan. 1999). And it appears to be unsettled whether Lanham Act claims might support a claim for punitive damages. *Compare First Savings Bank, F.S.B. v. U.S. Bancorp.*, 117 F. Supp. 2d 1078, 1087–88 (D. Kan. 2000) (suggesting punitive damages may be available), *with Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991) (suggesting punitive damages not available), *aff'd* 505 U.S. 763 (1992) (punitive damages not discussed); *see also Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 433–34 (2001) (reviewing allegedly excessive Lanham Act punitive award and observing, in dicta, broad state and legislative power to impose punitive damages); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1228–1231 (10th Cir. 2000) (upholding, as not unconstitutionally excessive, lower court's imposition of punitive damages on Lanham Act violation). Because this issue has not been raised or briefed, the Court assumes without deciding that punitive damages are available on Royal-Grow's Lanham Act claims.

There is a genuine dispute over materials facts concerning whether the EST Defendants engaged in willful, malicious, and/or wanton conduct. At least under Kansas law, wantonness occurs when a party acts with a "realization of the imminence of danger and a reckless disregard and complete indifference and unconcern to the probable consequences . . . ." *Soto v. City of Bonner Springs*, 291 Kan. 73, 82, 238 P.3d 278, 284 (2010) (quoting *Saunders v. Shaver*, 378 P.2d 70, 71 (1963)). Royal-Grow lists specific misrepresentations the EST Defendants allegedly made and asserts that EST falsely promised to cease infringing activities several years before it was caught. Doc. 102 at 81–82. These disputed allegations, which are credited at this summary judgment stage, *Adler*, 144 F.13d at 670, suffice to create a triable issue as to whether the defendants acted willfully or wantonly. Except as to its contract claim, *see* Note 6 *supra*, Royal-Grow is entitled to pursue punitive damages at trial.

### III

For the reasons set forth above, the EST Defendants' Motion for Partial Summary Judgment, Doc. 95, is GRANTED in part and DENIED in part.

It is so ordered.

Date:  March 16, 2021                             s/ Toby Crouse
                                                 Toby Crouse
                                                 United States District Judge